IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 7, 2020

**JERMAINE DAVIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 10-08139        Jennifer Johnson Mitchell, Judge

_____

**No. W2019-00743-CCA-R3-PC**

_____

Petitioner, Jermaine Davis, claims that he received ineffective assistance of counsel. Following a hearing, the post-conviction court denied his petition for post-conviction relief, finding that Petitioner failed to prove deficient performance and prejudice. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Anna R. Smith, Memphis, Tennessee, for the appellant, Jermaine Davis.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd and Paige Munn, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Procedural Background**

This case arises from allegations that Petitioner raped K.H. and C.T.,[1] while armed with two knives. A Shelby County jury convicted Petitioner of nine counts of aggravated rape, and the trial court imposed an effective sentence of 75 years at 100% to serve in confinement. In the direct appeal, this court affirmed the convictions and sentences, and the Tennessee Supreme Court denied further review. *State v. Jermaine Davis*, No. W2013-01123-CCA-R3-CD, 2014 WL 2902274, at *1 (Tenn. Crim. App. June 27, 2014), *perm. app. denied* (Tenn. Oct. 20, 2014).

---

[1] This court protects the identity of victims of sexual offenses through the use of initials.

On direct appeal, this court recited the facts as follows:

Officer Brian Onan testified that he worked for the Memphis Police Department and that he responded to a call in the early morning of April 17, 2010. He testified that the "type of call" he responded to was "a[n] aggravated criminal assault where one victim was out of the home and one victim was still inside the home with the suspect who was armed." He stated that he received the call around 2:30 a.m. and that he responded to the location provided within two to five minutes after receiving the call.

Officer Onan testified that he and another officer, Officer Kevin Frazier, arrived at the location where they found two white females standing beside a Mitsubishi Gallant. He testified to the following:

[Officer Frazier and I] drove up. [The two women came] directly to the window of the [police] car before we even had a chance to get out and pointed to the direction of an alley, on the backside . . . . Started explaining to us the situation. They were talking to us both at one time where we had to slow them down, very frantic, upset about what was going on. [One woman] started telling me that she had already been raped and had gotten out of the home and [we] had to figure out why the other [woman] was there. She was a friend that had been called by the other [woman], came over there and was telling me that her other friend was still in the home with the armed suspect.

Officer Onan testified that he later identified the woman who came to his car window and said she had been raped as K.H. He stated that when he arrived, K.H. "obviously had been crying, eyes blurry[,]" and that she was talking fast, very upset, and that she was "excited." Officer Onan said the second woman was named "Lacey," and she too was "excited" and upset about the friend who was still inside the home.

Officer Onan testified that K.H. told him that the friend still inside the home was named "Cassandra." At that point the officer began to walk down the alleyway where the women indicated the home was located. Before he could reach the home identified by K.H., the second victim, C.T., came out of the home. Officer Onan stated that she was crying and saying that she had been assaulted or raped, and he stated that she was carrying her "panties." He stated that she was extremely upset and crying "nonstop the

- 2 -

whole time." Officer Onan testified that he and Officer Frazier walked K.H., C.T., and "Lacey" back to his police car as other squad cars started to arrive at the scene. During the walk to his police car, C.T. said she had been "assaulted at knife point" but did not go into more detail at that moment. He stated that the victims named [Petitioner] as the person who had assaulted and raped them.

Officer Onan testified that, once backup had arrived at the scene and the victims were safe, he and Officer Frazier returned to the residence from which the second victim had exited. Other officers surrounded the home and started announcing a police presence while knocking on the doors and windows. Officer Onan testified that, at some point, the owners of the home had been called, and they arrived at the scene and provided officers with a key to enter the home. He stated that no less than eight officers entered the home with their weapons drawn and yelling "Memphis Police." Once inside, the officers checked and "cleared" each room, until they found one man in the master bedroom. The man was in a bed, under the covers, and pretended to be asleep when the officers approached him. Officer Onan identified [Petitioner] in the courtroom as the man they found inside the home.

Officer Onan stated that the officers got [Petitioner] out of the bed, handcuffed him, and walked him out of the house, where he was detained in a police car. Officer Onan recalled that he then interviewed the two victims who were still crying and upset. The victims were transported to the Memphis Rape Crisis Center.

On cross-examination, Officer Onan testified that, when he found [Petitioner] in the bed inside the house, [Petitioner] did not say anything but appeared coherent.

K.H. testified that in April 2010 she was working at Circle K. She stated that she had met C.T. through a friend named Lacey. K.H. stated that she "knew of" [Petitioner], whom she identified in court, because he had come to the Circle K a couple of times with Lacey. She recalled that, on the night of April 16, 2010, while she was at Circle K, Lacey and [Petitioner] called her cellular telephone to ask her to give [Petitioner] a ride to "Sycamore View." She stated that [Petitioner] was going to give her fifteen dollars['] worth of gas money in exchange for a ride.

K.H. testified that she and C.T. had plans to "chill" that night, and C.T. arrived at Circle K soon after [Petitioner] requested a ride from K.H. K.H. testified that she asked C.T., who also knew [Petitioner] through Lacey, if she wanted to ride with her to take [Petitioner] to Sycamore View.

K.H. testified that she and C.T. left Circle K to pick up [Petitioner] at his mother's house, and they found him standing outside on a corner near his mother's house when they arrived. She testified that she was driving a Mitsubishi Gallant, with C.T. in the passenger seat, and [Petitioner] got in the backseat. On the way to Sycamore View, [Petitioner] told the two victims that he needed to go to Waffle House instead of Sycamore View, and the victims agreed to take him there. At Waffle House, [Petitioner] got out of the car and said he was meeting up with someone there. He told the victims he would be back with the fifteen dollars for gas money, but the victims did not wait in the car very long for [Petitioner] to come back. K.H. said when they realized he was not coming back, she and C.T. drove away in the direction of C.T.'s home.

K.H. testified that [Petitioner] called her back on her cellular telephone and asked the victims to meet him at a gas station across the street from the Waffle House, so they turned the car around to meet him, in the hopes of getting the fifteen dollars he owed to K.H. At the gas station, the victims waited for [Petitioner] and called his cellular telephone. When he did not meet them or answer his telephone, the victim[s] decided to leave and "not worry" about the fifteen dollars. After they drove away from the gas station, [Petitioner] called again and told the victims to meet him at a home in C.T.'s neighborhood. The home was "right on the way" to where C.T. lived, so they agreed to meet [Petitioner] there. K.H. stated that [Petitioner] said he would give her the fifteen dollars.

K.H. testified that, once she and C.T. arrived at the home, [Petitioner] told them that they could "come in to chill, [and] chat," which they did. [Petitioner] said the fifteen dollars was inside the home. Once inside, K.H. and C.T. stood in the kitchen, while [Petitioner] left the room. At that point, the two victims noticed, based on the items taped to the refrigerator, that it was not [Petitioner]'s home, and they became uncomfortable. When [Petitioner] returned to the kitchen, he told the victims that they could go into the bedroom and sit down, and they did so. [Petitioner] then left the bedroom for a "couple" minutes and when he returned he asked the victims if they wanted to make $100 and watch him masturbate. K.H. testified that, at this point, she knew that she and C.T.

should leave. They responded "no" to [Petitioner]'s request and "started heading for the door." [Petitioner] was in front of the victims, and he suddenly turned around and "had knives in his hand." K.H. agreed that [Petitioner] seemed "aggressive," and she was frightened. She stated that the victims followed [Petitioner]'s instructions so they would not get hurt.

K.H. testified that [Petitioner], while still holding the knives, told the victims to remove their shirts. He then instructed K.H. to kiss him and C.T. to perform oral sex on him. She agreed that she saw [Petitioner] put his penis in C.T.'s mouth. The two victims and [Petitioner] went into the bedroom, and K.H. sat in a chair. [Petitioner] told K.H. to remove her clothes, which she did. [Petitioner], with the knives in his hand, told K.H. to get on the bed and perform oral sex on him. K.H. stated that he forced her to put his penis in her mouth. K.H. recalled that she "felt like [she] knew what was coming[,]" and so she asked [Petitioner] to use a condom for protection, to which he replied "No." K.H. said "something" in response, causing [Petitioner] to slap her "hard" across the face. The slap caused her ears to start ringing and her glasses to fly off her face and onto the floor. She recalled that the lights in the bedroom were on.

K.H. testified that, after [Petitioner] slapped her, he told C.T. to get on the bed and perform oral sex on him. K.H. did not know whether C.T. actually did because she looked away. [Petitioner] then told both victims to "get on all fours on the bed[ ][and] stick [their] butts out." They complied, and then, while both women faced the wall and [Petitioner] stood behind them, he penetrated K.H. vaginally and anally with his penis. K.H. did not know if he did the same to C.T. [Petitioner] then told C.T. to lay on the bed and told K.H. to perform oral sex on her. C.T. "laid back [on the bed] with her knees up" and K.H. laid down in between C.T.'s legs with [Petitioner] behind K.H. While he was behind her, [Petitioner] again penetrated K.H. vaginally and anally and told her to "eat [ ] out" C.T. K.H. stated that she laid her head on C.T.'s stomach to give [Petitioner] the "impression" that she was performing oral sex on C.T. K.H. stated that, while she could not see what [Petitioner] was doing behind her nor could she see the knives, she could feel what he was doing and "something metal" in her back, which she assumed were the knives. [Petitioner] then told the victims to "switch around" with K.H. on her back on the bed and C.T. laying on top of her. K.H. closed her eyes and did not see whether [Petitioner] penetrated C.T.

K.H. testified that she asked [Petitioner] if she could go get some "weed" from her car. K.H. stated that she did not, in fact, have any "weed"

- 5 -

in her car but that she thought the idea might appeal to [Petitioner] because he had earlier smoked a pipe, which she assumed contained drugs. K.H. stated that she was never in a position to get to her cellular telephone safely in order to make a call for help and that she feared she would die if she tried to get her telephone. K.H. stated that [Petitioner] agreed to let her get marijuana from her car but would not allow C.T. to leave. He escorted K.H. to the door and let her out of the home. K.H. stated that "as soon as [she] got in [her] car [she] turned that engine and [she] was gone." K.H. then called 911 and Lacey, because K.H. knew she was close by. Lacey arrived first and then the police, and K.H. told them she had been raped.

K.H. stated that when the police arrived they wanted to know where the home was, so K.H. took the officers to look for the home down an alleyway. They found C.T. walking down the alleyway. K.H. described C.T. as being "a mess" and carrying K.H.'s shoes and underwear with tears "falling out of her eyes." K.H. stated that, twenty to thirty minutes later, [Petitioner] was brought out of the home.

K.H. testified that she left the scene with the police and went to the sexual assault center where a rape kit was performed. She then went to the police precinct to give a statement. K.H. recalled that she signed her statement on April 17 at 3 p.m.

K.H. recalled that [Petitioner] ejaculated in her mouth but did not know if he had ejaculated in her vagina or anywhere else.

A recording of K.H.'s call to 911 was entered into the record as evidence and played for the jury. On the recording, K.H. can be heard crying hysterically, telling the dispatcher that [Petitioner] lured her and C.T. into a residence and forced them to undress and "do stuff." She is sobbing as she tells the dispatcher that C.T. is still inside the house with [Petitioner], who is using kitchen knives as weapons and that she fears C.T. is going to get hurt.

On cross-examination, K.H. reiterated that [Petitioner] was smoking from a "pipe," but she did not recognize the smell and stated that it was not marijuana. She recalled seeing him smoke the pipe one time while he and the two victims were in the bedroom. She agreed that he took a short "pull" from the pipe, lasting one or two seconds. K.H. agreed that both she and C.T. "faked" performing oral sex on each other.

- 6 -

K.H. clarified that [Petitioner] made C.T. perform oral sex on him in the hallway, and made K.H. perform oral sex on him in the bedroom. She agreed that both victims put their hands and knees on top of the bed when [Petitioner] made them get "on all fours." K .H. stated that [Petitioner] took his clothes off at some point, but she did not see him do so.

C.T. testified that she was nineteen years old on the night of April 16, 2010, and that she was working at Comprehensive Pharmacy Services at the time. She testified that she met K.H. at a gas station through her friend Lacey in 2009 and that she had met [Petitioner] once through Lacey. C.T. stated that on April 16 she went on a date at TGI Fridays, and her date dropped her off at Circle K to meet K.H. after dinner. C.T. recalled that K.H. had asked her to meet at Circle K to give [Petitioner] a ride and "drop him off somewhere for gas money." C.T. clarified that her date was originally going to drop her off at home, but her plans changed when K.H. asked her to meet.

C.T. testified that, once she arrived at Circle K, she, her date, and K.H. talked in the parking lot for ten minutes and then she left with K.H. to pick up [Petitioner]. She was "pretty sure [they] were supposed to pick [Petitioner] up from his house," but instead they picked him up on the corner. C.T. agreed that K.H. was driving, she was in the passenger's seat, and [Petitioner] was in the backseat. C.T. identified [Petitioner] in the courtroom as the man they picked up.

C.T. testified that they drove [Petitioner] to Waffle House where he got out. The victims waited in the parking lot for [Petitioner] to come back out, but, when he did not, they drove away. C.T. agreed that she discussed with K.H. whether [Petitioner] would pay the money he had promised. After driving away, K.H. called [Petitioner] about her money, and he told the victims to meet him at a gas station. When he failed to show up at the gas station, the victims again drove away to go to C.T.'s home. [Petitioner] called K.H. back and said he had "made it to the house [where] he had left his wallet[.]" C.T. recalled that the home was on Barbie Street, and, because it was on the way to her home, the victims decided to meet [Petitioner] there to get the money he owed K.H.

C.T. stated that the victims had trouble finding the home and drove down an alleyway where they found [Petitioner]. He directed them to the home and said the money was inside. C.T. said [Petitioner] invited them inside and they did not think "anything weird" about his invitation. C.T.

recalled that they went inside to the kitchen through a door in the garage, and [Petitioner] offered them two chairs at the back of the home. She recalled that [Petitioner] then came in the room and offered the victims one hundred dollars to watch him masturbate, and C.T. said, "I think it's time to go." As the victims walked toward the door, [Petitioner] got in front of them and grabbed two knives out of the kitchen. She described the knives as "long with a black handle." While the victim[s] stood in the hallway, [Petitioner] continued to hold the knives and told them to remove their shirts. C.T. said she could not see a way to escape and that she did not try to run out of the home because she was scared.

C.T. testified that, after [Petitioner] ordered the victims to remove their shirts, he told K.H. to kiss him and told C.T. to perform oral sex on him while the three were in the hallway. C.T. stated that she got on her knees and performed oral sex on [Petitioner] and that his penis went inside her mouth. With the knives still in his hand, [Petitioner] then took the victims to a bedroom. She recalled that K.H. went into the bedroom first and sat on the bed, and C.T. sat in a chair. C.T. tried to pull two cellular telephones out of her pockets to make a call for help, but "before [she] had gotten a chance, [Petitioner] had paid attention to [her] and was telling [her] to take [her] clothes off," so she dropped the telephones to the floor. [Petitioner] took both telephones after she dropped them, and she did not regain access to her telephones after that. C.T. recalled that, when [Petitioner] told her to take her clothes off, K.H. was performing oral sex on [Petitioner] on the bed. C.T. said she heard [Petitioner] "smack [K.H.] across the face," so C.T. looked up and saw that K.H.'s glasses had flown off her face. C.T. recalled that the lights in the bedroom were on.

C.T. recalled that, after [Petitioner] smacked K.H., he told C.T. to take off her clothes and get on the bed. [Petitioner] held both knives in his hand and ordered C.T. to perform oral sex on him. He then ordered C.T. to perform oral sex on K.H. while he penetrated C.T. both vaginally and anally. While [Petitioner] was raping her from behind, C.T. could feel the handle of the knives on her. C.T. recalled that [Petitioner] made the victims "swap" positions, with K.H. performing oral sex on C.T., and [Petitioner] raping K.H. from behind. C.T. recalled that K.H. asked to get a condom, and [Petitioner] said, "No," but at some point he let "someone" go to the car. C.T. said that K.H. went to the car because, C.T. assumed, K.H. still had her telephone. C.T. recalled that K.H. asked to go to the car multiple times and "probably by the second or third time" [Petitioner] allowed her to go.

C.T. testified that [Petitioner] escorted K.H. out of the house and locked the door behind her as she left. [Petitioner] returned to the bedroom and told C.T. that K.H. was gone and that he had locked the door. She recalled that he still had the knives with him. After K.H. left, C.T. observed [Petitioner] smoking out of a pipe, shaped like a tube. She testified that he turned the bedroom lights off, but she could still see. C.T. asked [Petitioner] if she could use the bathroom down the hallway. [Petitioner] followed her into the bathroom and forced C.T. to perform oral sex on him while she sat on the toilet. They went out into the hallway after she used the bathroom, and [Petitioner] forced her to bend over and started penetrating her vaginally. The victim recalled that [Petitioner] said that if she "wasn't going to do it right, he was going to put five fingers inside of [her]." C.T. stated that they went back into the bedroom, and [Petitioner] "had [her] bend over and he put his whole fist inside of [her]." C.T. described that as the "worst pain of the whole evening." She also stated that he again penetrated her vaginally with his penis.

C.T. testified that, when [Petitioner] put his fist inside of her vagina, she "straightened up and turn[ed] around like what are you doing[?]," and [Petitioner] said he would hit her "like he hit [K.H.]" if she did not stop. C.T. said [Petitioner] again penetrated her anally after he put his fist inside of her vagina. [Petitioner] also made her perform oral sex on him again, and he pulled her hair while she did so. C.T. said [Petitioner] was having trouble getting an erection. She recalled that he was still holding the knives when he told C.T. that he would hit her. She said he also put one of the knives against her arm.

C.T. testified that she asked [Petitioner] if she could leave to get cleaned up, because she was menstruating, and she would return later. She said that at some point [Petitioner] started dressing, so she did the same. [Petitioner] returned her cellular telephones to her, and then he let her out of the house through the garage. When [Petitioner] opened the garage door for C.T. to "bend under" she saw police outside the home. C.T. exited the garage into the alleyway, saw a light, and started crying because she was "scared," "hurting," and "happy to be out." Walking down the alleyway toward the light, C.T. saw Lacey, K.H., and a police officer. She was "hysterical[ly] bawling" and in pain from when [Petitioner] put his fist inside her.

C.T. stated that she left the scene and went to the rape crisis center before giving a statement to police. She recalled being in the back of the police car when [Petitioner] was brought out of the home by the police.

Officer Kevin Frazier testified that he worked for the Memphis Police Department and was with his partner, Officer Onan, on April 17, 2010. He testified that they responded to a criminal assault call at 2:30 a.m. He stated that it took he and Officer Onan about fifteen minutes to respond to the location. Once they arrived, they were approached by a "frantic" woman who was crying. The woman alleged that she had been raped and her friend was still inside the house being raped as well. He stated that the woman showed them where the house was, but, before they could walk to it, the other friend approached them, also in a frantic state. Officer Frazier stated that they put both women in the squad car and other officers arrived at the scene to help secure the location.

Officer Frazier testified that police officers began beating on the doors and windows of the home where the women indicated the perpetrator was located. He stated that eventually the homeowner arrived to allow officers inside, and an officer brought out an individual from inside.

Sergeant Gerald Paige testified that he worked for the Memphis Police Department and was called to the scene on April 17, 2010, to collect evidence of the crime. He stated that the victims had left the scene when he arrived. He stated that he was taken inside to the back bedroom of the house where the assault had taken place. Sergeant Paige stated that he also searched the rest of the home. He stated that he found two knives on the table in the kitchen. In the bedroom, which he described as being in "disarray," Sergeant Frazier found a mattress on the floor with black satin sheets on it. He stated that he used an "alternative light source" to reveal stains on the sheets not visible to the naked eye. He testified that the alternative light source revealed stains on the sheets and the floor, and he did a DNA sample on those stains. He stated that he cut out a piece of carpet from the floor where the stains were and catalogued it into evidence in addition to the bed sheet.

On cross-examination, Sergeant Paige stated that he could not tell if the stains were recent.

Thomas Shouse testified that he was a criminal investigator with the District Attorney General's office and that he took a DNA sample from [Petitioner] in the course of his investigation related to this case. He stated

that the sample was taken from [Petitioner] on September 21, 2011, sealed and sent to the Tennessee Bureau of Investigation ("TBI") lab for analysis. Mr. Shouse stated that he took [Petitioner]'s DNA sample, along with the rape kits from the two victims, to the TBI.

Jean Listion testified that she and her husband owned the home where the rapes took place and that they had bought it for their grandson. She testified that she visited the home every day and had been there on April 16. She stated that she had never heard of or met [Petitioner] before the night of the crime. She stated that in the early morning hours of April 17, she and her husband got a call from the police department telling them that there was a situation at their grandson's home. Ms. Listion stated that she gave the officers a key to the home, and then officers l[ed] a man out of the house. She stated that her grandson was not at his home that night.

Margaret McCallum testified that she was a nurse at the Rape Crisis Center where the two victims were taken on the morning of April 17, 2010. Ms. McCallum was qualified, based on her training and experience, as an expert in the field of forensic nursing. She stated that she conducted a physical examination and performed a rape kit on C.T. at 7:30 a.m. on April 17, 2010, and K.H. at 10:50 a.m. on April 17, 2010.

James Lawrence testified that he was a TBI Special Agent Forensic Scientist. He was qualified as an expert in the fields of serology and DNA forensic analysis. Mr. Lawrence testified that he analyzed the rape kits performed on the victims and the DNA sample taken from [Petitioner]. His findings were contained in a report dated June 11, 2010, which was admitted into evidence. Mr. Lawrence testified that the vaginal swab taken from C.T. matched [Petitioner]'s DNA sample. He testified that the vaginal swab taken from K.H. was "consistent" with [Petitioner]'s DNA sample. Mr. Lawrence clarified that both victims' vaginal swabs contained matches with [Petitioner]'s DNA, each to a different extent.

*Jermaine Davis*, 2014 WL 2902274, at *1-9.

### *Post-Conviction Relief Petition*

Petitioner filed a timely pro se petition for post-conviction relief, and the post-conviction court appointed counsel, who filed an amended petition. In his pro se petition,

Petitioner claimed that he received ineffective assistance of counsel because trial counsel failed:

(1) to seek a mental evaluation,

(2) to file any pretrial motions on defensive issues,

(3) to adequately investigate the victims,

(4) to call [P]etitioner's witnesses,

(5) to obtain a private investigator in this case, and

(6) to properly communicate and explain the formal plea offer from the State.

In the amended petition, Petitioner claimed that trial counsel was ineffective for failing:

(1) to take rudimentary steps to investigate his case,

(2) to effectively cross[-]examine witnesses, including the victims,

(3) to preserve the record on appeal related to multiple evidentiary arguments,

(4) to put forward any proof to deny the State's case,

(5) to make more than a perfunctory opening or closing argument, and

(6) failing to zealously or effectively advocate for Petitioner's innocence.

### *December 13, 2018 Evidentiary Hearing*

Petitioner's father testified that he worked for the Catholic Diocese as Director of Prison Ministries. He hired trial counsel to represent Petitioner. He said that he talked to his son about hiring an investigator, but that trial counsel never asked for one. He said that he did not know the victims but that he had seen them in front of his house on at least two occasions. He said that he had never seen Petitioner "be violent" or "act aggressively toward other people." On cross-examination, Petitioner's father agreed that Petitioner had been convicted more than once of drug-related offenses.

- 12 -

Petitioner testified that he received a call from trial counsel seeking to represent him. Petitioner said that he did not know trial counsel before the call. He said that trial counsel represented him in general sessions court where he waived a preliminary hearing. After his appearance in general sessions court, his father paid another attorney to represent him, but that attorney "never answered the phone [and] never came and checked on [him]at the jail." Petitioner said that the other attorney did "absolutely nothing to defend [him]," so he "rehired" trial counsel to represent him in criminal court. He said that trial counsel was successful in getting his bond lowered but that he was still unable to make bond.

Petitioner said that trial counsel advised him that the State had agreed to a twenty-year sentence if he pled guilty. He said that trial counsel told him the most he could get if convicted was twenty-five years, so he turned down the plea offer thinking that he had little to risk by having a trial. He said that, if he had known he was facing "two hundred and twenty-five years," he would have accepted the plea offer.

Petitioner said that he tried to speak to trial counsel by phone but was told they should not talk about the case on the phone. He said that, during the three years he was incarcerated, trial counsel only came to visit him two or three times. He said that one of the times was "right before [his] trial." He said that the only other times he saw trial counsel was when they were in court. He said that he asked trial counsel about hiring an expert witness and told trial counsel that, if he found a private investigator, his father "would hire him." Petitioner said that trial counsel never got his cell phone records "to try to determine whether or not [he] had communicated with the victims prior to the day of the [] alleged attack." He said that he did not know what happened to his cell phone after it was taken from him when he was arrested. He said that the phone contained text messages with the victims about meeting at Incredible Pizza. He claimed that the victims called him and asked to come to the house where he was staying and that was how they ended up meeting that night. He said that trial counsel advised him that, if he testified the State could bring up his criminal convictions, which included an aggravated burglary, a felony theft, and a felony marijuana offense, so he decided not to testify. He said that while he was incarcerated awaiting trial, he was on a lot of "psychiatric medications" for bipolar and manic-depressive disorder. He said that he asked trial counsel to have him examined by a psychiatrist.

On cross-examination, Petitioner admitted that the drug conviction involved a plea of guilty in Texas to possession of fifty pounds of marijuana and that the theft conviction was for property valued over $10,000.00. He also admitted that he pled guilty in Texas to domestic violence involving his girlfriend but claimed that he "never put [his] hands on any woman." He also admitted that he was convicted of aggravated burglary and sentenced to three years' incarceration. When questioned about DNA evidence,

- 13 -

Petitioner claimed that he "didn't ask [trial counsel] to have no DNA done." He admitted that he told trial counsel "they shouldn't find any of my DNA on no women because we was having our fun." Petitioner then admitted that, after the DNA tests were performed, his DNA was found on both victims.

Petitioner said that he wanted trial counsel to have the victims tested for drugs, stating:

> We was having fun. It was drugs there and everything. They was doing cocaine. I was doing cocaine. The only thing they wasn't doing [was] smoking crack. And that's what I was doing in the privacy of the bathroom. But they was snorting cocaine. They was popping Lortabs and Xanaxes. We was all getting high in the house; okay?
>
> And that's when I asked [trial counsel] to have them tested for drugs, because if he had them tested for drugs, he'll see that we was having a drug party; okay? I offered them some money. But, like I said, I couldn't even -- I couldn't perform sexually because I could never get on hard because of all the drugs I had in my system, first thing.
>
> Second thing is, as far as they talking about the garage door was down, don't no -- didn't nobody -- didn't nobody even pull the cameras from the neighborhood to see that that -- that garage door was up the whole entire time. But nobody ever tried that.

Trial counsel was called as a witness by Petitioner. Trial counsel testified that he had been practicing criminal defense law for five years when he represented Petitioner. Trial counsel said that he was contacted by someone about representing Petitioner and was initially hired to handle the case at the general sessions level. He said that he advised Petitioner concerning the pros and cons of a preliminary hearing and that Petitioner decided he wanted to waive the hearing. Trial counsel said that he did not recall Petitioner telling him anything about being on medications. He said that he did not hire an investigator and did not recall the victims testifying that they did not know Petitioner before the events that led to the aggravated rape charges. When presented with the statement K.H. provided to the police, he agreed that K.H. said that Petitioner had come to the gas station a couple of times and that she "knew of him" and that Petitioner had called her. Trial counsel did not know how Petitioner got K.H.'s cell number. Trial counsel agreed that he did not attempt to examine Petitioner's or the victims' cell phones.

Trial counsel was questioned extensively concerning photographs of two knives that were introduced into evidence. He stated that he knew a third knife had been found in the bathroom at the scene but had not been taken into evidence and that the victims had

stated the Petitioner threatened them with two kitchen knives. Trial counsel agreed that he did not object to the introduction of pictures of the knives into evidence and did not "investigate the discreet meaning of each kind of knife." When pressed about the knives, trial counsel stated:

> I don't think the kind of knife would have made a difference unless it was either -- it's the difference between, say, a meat cleaver and a pen knife. But then a bread knife, a butcher knife, a -- you know, a steak knife is a little smaller. But they all kind of fit into kitchen knives.

Trial counsel was next asked about the testimony of the nurse practitioner that examined the victims. The testimony included statements made by the victims. Trial counsel agreed that he did not raise a hearsay objection. Trial counsel also agreed that he did not object to the State's closing argument, which post-conviction counsel characterized as a "Golden Rule" argument where the jury was asked "to place themselves in the minds of the victims." Specifically, post-conviction counsel asked trial counsel if he objected to the following statements made by the State during closing argument: "[y]ou can feel the terror" and "as women, we could fight back." Trial counsel agreed that he did not object to these arguments. Trial counsel said that it had been five years since the trial, and he could not remember if he made any objections during the trial.

On cross-examination by the State, trial counsel agreed that the recording of the victim's 911 call "was awful to hear." He agreed that, when he listened to the 911 recording, he "could hear the terror in her screams" about how she had been raped. Trial counsel agreed that the terror in the 911 call was what the State was trying to convey during its closing argument and said that he did not believe it would have been an "appropriate objection." Trial counsel also agreed that the State referred to the knives as butcher knives and said that he did not find anything objectionable to that reference or to the introduction of the photograph of the knives found at the scene. He said that the victims testified they knew or "knew of" Petitioner through a mutual friend named Lacey. He said that was consistent with what Petitioner had told him.

Trial counsel testified that, if he had thought that there had been a need for an investigator, he would have suggested that they hire one. He said that he was concerned about Petitioner testifying because of his prior convictions and that, ultimately, Petitioner made the decision not to testify.

Trial counsel said that Petitioner did not tell him about any mental issues and that he had no "concerns about [Petitioner's] intellectual capacity." Trial counsel said that he did not seek to have Petitioner mentally evaluated because there was no "indication of any problems."

- 15 -

Post-conviction counsel questioned trial counsel about his trial strategy. Trial counsel testified that his initial trial strategy—to claim that someone other than Petitioner raped the victims—was based on information provided by Petitioner. Trial counsel said Petitioner told him that:

> he was unable to perform and he was -- he always -- he repeatedly told me, "[t]here is no way there is my semen in their vaginas." He said that over and over and over again. And that's why I was determined to get the DNA results, because if their DNA results showed that it was not him, that would clearly exonerate him.

Trial counsel said that, when the DNA test results came back as a match to Petitioner, he advised Petitioner to take the State's twenty-year plea deal but that Petitioner rejected his advice and the offer. Trial counsel said that he was forced to abandon the original trial strategy and decided to argue that Petitioner had "consensual sex with both [victims]."

Trial counsel stated that he never told Petitioner that, if he went to trial, the maximum sentence Petitioner faced was twenty-five years. He said that he explained that the trial court could run the sentences consecutively and that he told Petitioner, who was thirty-five years old at the time of trial, that he could be looking at spending the rest of his life in prison if convicted.

### Post-Conviction Court's Order

The post-conviction court denied the petition by an order filed on March 29, 2019.

Concerning trial counsel's failure to object to "allegedly inflammatory statements" during closing argument, the post-conviction court accredited trial counsel's testimony that he did not think it was advantageous to object. The court found that trial counsel made a tactical decision not to object to the State's arguments and that trial counsel "often choose not to object to damaging evidence for strategic reasons so as to avoid emphasizing the unfavorable evidence." The court determined that Petitioner failed to overcome the presumption that trial counsel acted according to sound trial strategy and failed to prove that trial counsel's failure to object prejudiced Petitioner's trial.

The post-conviction court next addressed Petitioner's claim that trial counsel "acted deficiently when he failed to challenge a victim's credibility during trial." Concerning not cross-examining the victims about knowing Petitioner before the rapes, the court accredited trial counsel's testimony that the victims were very credible and that "badgering the victims was not going to be effective given [that] Petitioner admitted to

being with them at the time of the alleged event." The court noted that, "[b]ecause of the traumatic nature of the case, it was [trial counsel's] opinion that to challenge the witnesses with questions about their relationship would appear disingenuous." The court determined that Petitioner failed to show that trial counsel "did not act according to sound trial strategy on these grounds, and [that] the [first prong of the] *Strickland* test [was] not satisfied."

Concerning the claim that trial counsel "was ineffective because he failed to adequately communicate the consequences of rejecting a plea agreement," the post-conviction court noted that trial counsel specifically testified that he explained to Petitioner that some or all of the eleven counts of rape could be ordered to be served consecutively and that, after the DNA test results, trial counsel advised Petitioner to accept the plea deal. The court determined that Petitioner "failed to prove either deficiency of performance or prejudice to the outcome of his case."

Concerning Petitioner's claim that trial counsel "generally did not offer enough resistance to the State's case because he did not hire a private investigator and did not introduce character evidence to support Petitioner," the post-conviction court noted that "Petitioner told [trial counsel] during the trial proceedings that DNA evidence would exonerate him; [c]ounsel planned his defense accordingly," and that "[o]perating under the false assumption that such evidence would be exonerating, [c]ounsel did not see it necessary to hire a private investigator to further probe the case in the time before trial." The court accredited trial counsel's testimony that he "did do some personal investigation into the case before trial like checking out the victims' Facebook pages to see if they had mentioned the events from April 2010." The court found that trial counsel's "conduct was reasonable under the circumstances."

The post-conviction court accredited trial counsel's testimony that "introduction of [character] evidence would have been unsound trial strategy" in light of Petitioner's lengthy criminal history "because it would have allowed Petitioner's own credibility to be challenged." The court found, "Because this was reasonable action or inaction by [c]ounsel, and because there is no further evidence this conduct was deficient and prejudiced Petitioner's trial, Petitioner is not entitled to post-conviction relief on these grounds."

Following entry of the post-conviction court's order denying relief, Petitioner timely appealed.

**Analysis**

On appeal, Petitioner argues that trial counsel was deficient for (1) failing to move to exclude or object to damaging testimony and evidence, (2) failing to meaningfully cross-examine the State's witnesses, (3) failing to meaningfully investigate, (4) failing to argue against the State's closing argument, (5) and failing to have a trial strategy. Petitioner also claims that the cumulative effect of trial counsel's deficiencies justifies post-conviction relief. The State argues that "trial counsel's representation was effective, and his decisions were based on a reasonable trial strategy." The State also argues that Petitioner failed to establish that any of trial counsel's strategic decisions prejudiced Petitioner. We agree with the State.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. Tenn. Code Ann. § 40-30-103 (2019); *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2019); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (*quoting Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland,* 466 U.S. at 697. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial. *Id.* The stronger the proof of guilt presented at trial, the more difficult it is to prove the prejudice prong of *Strickland.* When proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Randy Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice), *perm. app. denied* (Tenn. Sept. 19, 2012); *Raymond E. McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of item of evidence at trial).

### *(1) Failing to Seek to Exclude or Object to Damaging Testimony and Evidence*

#### *(a) Testimony of Officers Onan and Frazier*

Petitioner claims that trial counsel failed to make an objection based on "*Crawford*" to Officers Onan and Frazier reading testimonial statements of the victims included in the officers' reports before either victim testified at trial. Testimonial hearsay is only admissible when the hearsay declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Two years after *Crawford*, the United States Supreme Court stated that "[a] critical portion of [the *Crawford*] holding . . . is the phrase 'testimonial statements.'" *Davis v. Washington*, 547 U.S. 813, 821 (2006). In *Davis*, the police arrived within four minutes of the 911 call and observed the victim in a "shaken state, [with] 'fresh injuries on her forearm and her face,' and her 'frantic efforts to gather her belongings and her children so that they could leave the residence.'" *Id.* at 818 (quoting *State v. Davis*, 111 P.3d 844, 847 (Wash. 2005) (en banc)). In discussing what is and is not a testimonial statement, the Supreme Court stated:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances

objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822. The Court noted that the "difference between the interrogation in *Davis* and the one in *Crawford* is apparent on the face of things. In *Davis*, [the victim] was speaking about events *as they were actually happening*[.]" *Id.* at 827 (emphasis in original).

Although Petitioner claims generally that the victims' statements in the officers' reports were inadmissible under *Crawford*, Petitioner failed to point out any specific statements of the victims that he claims were testimonial. The officers obtained information from K.H. at the scene of the rape while C.T. remained in the house with Petitioner where the rapes occurred or were occurring. When C.T. managed to escape from the house, Petitioner remained inside. As was the case in *Davis*, both K.H. and C.T. were speaking to officers about events "as they were actually happening." *Id.* Petitioner has failed to prove trial counsel was deficient for failing to object.

The State points out that the victims testified later in the trial to substantially the same information they provided to the police. Petitioner had ample opportunity to cross-examine the victims at that time about any statements made to the police at the scene or during the investigation. Assuming some of the statements of the victims in the report may have been excluded if trial counsel had objected, Petitioner has still failed to show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. We determine that the post-conviction court properly found that Petitioner failed to show prejudice.

*(b) Testimony of Nurse McCallum*

Petitioner makes a similar *Crawford* claim about Ms. McCallum, the Rape Crisis Center nurse who examined the victims. During Ms. McCallum's testimony, she read the "narrative history of the complaint" aloud to summarize the victims' statements during her examination. Again, Petitioner fails to cite any specific statements he claims were testimonial and inadmissible. Both victims testified at trial and were subject to cross-examination. Moreover, Petitioner has failed to prove that counsel's failure to object created a "reasonable probability . . . sufficient to undermine confidence in the outcome" of the trial that the result would have been different. *Id.* Again, we determine that the post-conviction court properly found that Petitioner failed to prove the prejudice prong of *Strickland*.

- 20 -

*(c) Testimony of Homeowner*

Petitioner claims that trial counsel was deficient in failing to object to the testimony of the owner of the home where the rapes occurred that a stain on the carpet "looked like dried semen."[2] Although this testimony may have been found inadmissible if trial counsel had objected, in light of the proof that swabs done at the Rape Crisis Center recovered Petitioner's DNA from seminal fluid in the vaginal area of both victims, we determine that Petitioner has not demonstrated that the homeowner's statement prejudiced Petitioner or undermined confidence in the jury's verdict of guilt. *Strickland*, 466 U.S. at 694.

*(d) Testimony Concerning "Butcher Knives" and Photograph of Two Knives*

Petitioner claims that trial counsel's representation was deficient because he failed to object to the admission of a photograph of two "knives that did not match the victims' descriptions of the knives" used during the crime and because he failed to object to the State's referring to "the knives as 'butcher knives' in opening and closing statements." In her 911 call, K.H. told the operator that C.T. was still inside the house and that Petitioner was using "kitchen knives as weapons." In his testimony at the post-conviction hearing, trial counsel admitted that he did not object to the introduction of the photograph of the two knives or to the State's referring to the knives as butcher knives. Trial counsel explained:

> I don't think the kind of knife would have made a difference unless it was either -- it's the difference between, say, a meat cleaver and a pen knife. But then a bread knife, a butcher knife, a -- you know, a steak knife is a little smaller. But they all kind of fit into kitchen knives.

Trial counsel explained that he did not object to the *type* of knife that Petitioner allegedly used to threaten the victims because his trial strategy was to claim Petitioner had consensual sex with the victims and that, if the jury believed Petitioner used any knife, it would undermine his strategy.

Because the police failed to take into evidence a third knife found in the bathroom, the State argued that it was not claiming the two knives in the photograph were the two knives used in the rapes. Although an objection may have been warranted, we need not decide whether trial counsel's failure to object was deficient performance or a strategic decision. Based on the overwhelming evidence of guilt, including the victims' testimony

---

[2] We take judicial notice of the trial transcript included in the record in the direct appeal. *Jermaine Davis*, W2013-01123-CCA-R3-CD, 2014 WL 2902274, at *1.

- 21 -

that Petitioner was armed with two knives, the fact that Petitioner was still in the house when police arrived, and the fact that knives were found in the house, we determine that Petitioner has failed to show that trial counsel's failure to object to the photograph of the knives or failure to object to the State's referring to the knives as "butcher knives" prejudiced Petitioner or undermined confidence in the jury's verdict of guilt. *Id.* Failure to satisfy either *Strickland* prong results in the denial of relief. *Id*. at 697.

### *(2) Failing to Meaningfully Cross-examine the State's Witnesses*

Petitioner argues that trial counsel's representation was deficient because he failed to adequately cross-examine *any* witnesses. Because only the testimony of the victims and Ms. McCallum, a nurse at the Rape Crisis Center, was developed at the post-conviction hearing and discussed in Petitioner's brief, we will limit our analysis to those witnesses. Petitioner's allegations regarding the cross-examination of any other witnesses are waived for failure to cite to the record or supporting authorities. *See* Tenn. Ct. Crim. App. R. 10(b).

Petitioner claims that trial counsel's "cross-examination of the victims w[as] limited to repeating where they were in the home, whether [P]etitioner was using drugs, and repeating the details of the oral sex allegations." However, that claim is not accurate. The trial transcript from the direct appeal shows that, during the cross-examination of K.H., trial counsel was able to get her to admit that Petitioner was not carrying any knives when he went into the bedroom and lit his pipe. Concerning his cross-examination of the victims, trial counsel explained that he thought the victims were very credible witnesses, so he sought to "gently undermine [their] credibility" without alienating the jury by badgering them.

Second, Petitioner claims that, during his cross-examination of Ms. McCallum, trial counsel "minimally touched on the idea that the lack of injuries could mean that there was force, [and] devolved into a series of apologies and confusion, with no attempt to reign in the witness." Again, the trial transcript shows that trial counsel was successful in getting Ms. McCallum to state that during her examinations of the victims she found no injuries in the victims' vaginal and anal areas and to admit that it was possible that the victims did not have any injuries because "there was no attack done[.]"

The post-conviction court found that trial counsel's non-confrontational cross-examination of the victims was sound trial strategy and that his cross-examination of Ms. McCallum was not deficient. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson*, 197 S.W.3d at 790 (Tenn. Crim. App. 2006). Concerning the general claim

that trial counsel did not meaningfully cross-examine the State's witnesses, we determine that Petitioner failed to show deficient performance.

### (3) Failing to Adequately Investigate

Petitioner claims that trial counsel failed to adequately investigate so that trial counsel would be prepared for trial. Petitioner argues that trial counsel was deficient because he failed to obtain cell phone records, failed to interview the residents in the neighborhood and obtain security camera footage from nearby residences where the rape occurred, and failed to investigate the victims' drug use and prior relationship with Petitioner.

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. In carrying out this duty, counsel must decide what investigation is needed and what "investigations [are] unnecessary." *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

Petitioner claims that trial counsel was deficient for failing to obtain cell phone records of the victims. However, the victims testified that they "knew of" or knew Petitioner through a mutual friend, that they exchanged text messages with Petitioner, and received phone calls from Petitioner. Petitioner has failed to show how trial counsel's failure to obtain cell phone records could have impeached the victims' testimony or in any way benefitted the defense.

Petitioner claims that trial counsel was deficient because he failed to interview the residents in the neighborhood where the rape occurred and failed to obtain security camera footage from nearby residences. Aside from a vague issue concerning whether the garage door was open or closed when the rapes occurred, Petitioner has failed to show how interviewing the neighbors or obtaining video footage, if same actually existed, would have been of any benefit to the defense.

Petitioner claims that trial counsel was deficient for failing to obtain drug testing of the victims. Petitioner has failed to explain how trial counsel could have obtained an order forcing the victims to be tested for drugs, but even assuming that trial counsel could have forced the victims to submit to testing at or near the date of the rape, that the test came back positive, and that trial counsel was successful in getting the test introduced into evidence or using the test to cross-examine the victims, it would not change the overwhelming evidence of guilt presented at trial. Using drugs does not amount to

- 23 -

consent to sex. Petitioner has failed to show trial counsel was deficient in not obtaining a drug test of the victims or that he was prejudiced.

The post-conviction court found that trial counsel conducted an independent investigation that "was reasonable under the circumstances." We agree with the post-conviction court's findings and conclusion that Petitioner failed to prove by clear and convincing evidence that trial counsel's investigation was deficient.

### (4) Failing to Argue Against the State's Closing Argument

#### (a) Reasonable Doubt

Petitioner avers that trial counsel was deficient by failing to adequately argue reasonable doubt. In light of the overwhelming evidence of guilt, Petitioner has failed to show how an argument concerning reasonable doubt could have led to a different verdict. Petitioner has failed to prove prejudice.

#### (b) "Golden Rule" Argument

Petitioner asserts that trial counsel rendered ineffective assistance by failing to object to the State's "Golden Rule" closing argument. Although the claim was not specifically raised in the pro se petition or amended petition, the issue was argued to and addressed by the post-conviction court, and the claim is included in the issues raised in Petitioner's brief. We will treat the claim as included under the general claim concerning trial counsel's failure to argue against the State's closing argument. Trial counsel testified that he chose not to object because he believed that the comment was an accurate description of the evidence, that the statements did not ask the jury to put themselves in the victims' shoes, and because he did not want to draw the jury's attention to the 911 call.

"[A]rgument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Tennessee courts give great latitude to counsel arguing their cases to the jury. *Id*. Closing arguments provide each side an opportunity to "present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." *Id*. at 131 (internal citations omitted).

During closing argument, the prosecutor told the jury regarding the 911 call: "You can . . . not only hear the terror in [K.H.]'s voice, you can feel it. . . . You can feel the terror." In the rebuttal argument, the female prosecutor stated "as women, we like to believe we would act differently" from the manner in which the victims acted, and "I would like to believe I would." In his brief, Petitioner refers to these statements as a "Golden Rule" argument, which is an argument "suggesting to the jurors that they place themselves in the position" of the victims. *Esmail Ashdji and Faizeh Ashdji v. Rodney E. Yardley*, CA No. 1188, 1988 WL 116498, at *2 (Tenn. Ct. App. Nov. 4, 1988) (citation omitted); *State v. Randy Anthony Sanders*, No. M2014-02535-CCA-R3-CD, 2015 WL 5461660, at *6 (Tenn. Crim. App. Sept. 18, 2015), *perm. app. denied* (Tenn. Jan. 19, 2016). Petitioner claims "that, in both instances, the State asked the jury to view themselves in a manner that would place them into the mindset of the alleged victims."

We do not agree with Petitioner's characterization of the arguments, but even if we did, trial counsel explained his reasons for not objecting to the closing arguments, and just as the post-conviction court did, we decline to second-guess trial counsel's strategic decisions and tactical choices. *Granderson*, 197 S.W.3d at 790. We agree with the post-conviction court's finding that Petitioner failed to overcome the presumption that trial counsel acted according to sound trial strategy and failed to prove that trial counsel's failure to object to the State's closing arguments prejudiced Petitioner's trial.

### (5) Failure to Have a Trial Strategy

Petitioner claims that "when all of [trial counsel's] actions in this case are taken together, it becomes clear that there was no strategy for the trial at all." Trial counsel testified that his initial trial strategy was to argue that someone other than Petitioner raped the victims. Trial counsel formulated this strategy based on what Petitioner told him—that Petitioner's DNA could not be found on the victims because he was incapable of having an erection. After the TBI lab found Petitioner's DNA in semen from vaginal swabs of the victims, trial counsel was forced to abandon this trial strategy. When Petitioner then declined to accept trial counsel's advice concerning acceptance of the plea offer, trial counsel was forced to come up with a new trial strategy—that the sexual acts were consensual. We agree with the post-conviction court's finding that Petitioner failed to show that trial counsel "did not act according to sound trial strategy." Petitioner has failed to prove the deficient performance prong of *Strickland*.

The post-conviction court found that trial counsel conducted an independent investigation that "was reasonable under the circumstances." We agree with the post-conviction court's conclusion that Petitioner failed to prove by clear and convincing evidence that trial counsel's investigation was deficient.

*(6) Cumulative Effect of Alleged Deficiencies*

Petitioner avers that the cumulative effect of deficient performance deprived Petitioner of a meaningful defense and justifies a new trial. Although proof of one or more examples of a trial counsel's deficient performance, may not be sufficient, "the cumulative effect" of such errors may be sufficient to "deprive the defendant of a meaningful defense" and to justify post-conviction relief. *State v. Zimmerman*, 823 S.W.2d 220, 228 (Tenn. Crim. App. 1991).

When faced with overwhelming evidence against a defendant, trial counsel is often limited in what trial strategy to employ and how to present a "meaningful defense." *Id.* The proof at trial against Petitioner was overwhelming, and Petitioner has failed to show that he was "deprived of a meaningful defense" or that a new trial is justified. *Id.* Petitioner has failed to prove any deficient performance on the part of trial counsel so there can be no cumulative effect. Accordingly, Petitioner is not entitled to post-conviction relief based on cumulative error.

**Conclusion**

We affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE